146 P.3d 265 (2006)
John BEJARANO, a/k/a Juan Munoz, a/k/a John Bejarno, Appellant,
v.
The STATE of Nevada, Respondent.
No. 44297.
Supreme Court of Nevada.
November 16, 2006.
*268 Franny A. Forsman, Federal Public Defender, and David S. Anthony, Assistant Federal Public Defender, Las Vegas, for Appellant.
George Chanos, Attorney General, Carson City; Richard A. Gammick, District Attorney, and Gary H. Hatlestad, Deputy District Attorney, Washoe County, for Respondent.
Before the Court En Banc.

OPINION
ROSE, C.J.
In this appeal, we decide whether this court's 2004 decision in McConnell v. State[1] retroactively applies to appellant John Bejarano's final conviction and sentence of death. We hold that McConnell set forth a new rule of substantive law that must be given retroactive application.
Applying our holding to Bejarano's case, we conclude that the robbery felony aggravator found by the jury is invalid pursuant to McConnell. Because the receiving-money aggravator also found by the jury was based on the robbery, it too is invalid. We strike them both and reweigh. After doing so, we conclude that any effect these two aggravators had on the jury's decision to impose a death sentence was harmless beyond a reasonable doubt. We affirm the district court's order denying Bejarano post-conviction relief.

FACTS
On March 2, 1987, Reno taxicab driver Roland Wright was found dead, shot twice in the head at point-blank range with a sawed-off rifle and robbed of about $100 to $250. Bejarano was later arrested and charged with the following crimes: murder with the use of a deadly weapon, robbery with the use of a deadly weapon, being an ex-felon in possession of a firearm, possession and disposition of a sawed-off rifle, possession of a stolen motor vehicle, and carrying a concealed weapon. The murder count charged in pertinent part that Bejarano "did willfully, unlawfully, and with malice aforethought, deliberation, and premeditation, and during the course and commission of a robbery, kill and murder [Wright]."
The State later filed a notice of intent to seek death, alleging the following six aggravating circumstances: (1) Bejarano was under a sentence of imprisonment pursuant to NRS 200.033(1), i.e., probation from a 1985 misdemeanor conviction in Idaho for battery on a police officer; (2) he had a previous felony conviction involving the use or threat of violence pursuant to NRS 200.033(2), i.e., a 1979 conviction for aggravated assault in Idaho; (3) he had a previous felony conviction involving the use or threat of violence pursuant to NRS 200.033(2), i.e., a 1981 conviction for aggravated assault in Idaho; (4) the murder was committed during the commission of a robbery pursuant to NRS 200.033(4); (5) the murder was committed to avoid or prevent a lawful arrest pursuant to NRS 200.033(5); and (6) the murder was committed for the purpose of receiving money or any other thing of monetary value pursuant to NRS 200.033(6).
*269 A six-day jury trial began in March 1988, after which the jury found Bejarano guilty of all charges. After the ensuing penalty hearing, the jury imposed a sentence of death. This court affirmed Bejarano's conviction and death sentence in an unpublished order in December 1988.[2]
Bejarano thereafter filed in state district courts two post-conviction petitions challenging his conviction. In each case, this court issued an opinion affirming the district court decisions to deny him relief.[3]
In September 2003, Bejarano filed the instant petition in district court and subsequently filed an amended petition. The district court denied Bejarano's petition on October 7, 2004, finding it untimely and procedurally barred pursuant to NRS 34.726(1). This appeal followed.

DISCUSSION
Bejarano raises numerous issues on appeal from the district court's order denying him relief in thishis thirdstate post-conviction petition. The most important question raised is: Does this court's 2004 opinion in McConnell apply retroactively to final cases?
As a threshold matter, we recognize that Bejarano did not adequately raise his McConnell challenge before the district court. Normally, we will review on appeal only claims presented to the district court in the first instance.[4] Here, however, the district court denied Bejarano's petition before this court published McConnell. Thus, a claim pursuant to that decision was not reasonably available to Bejarano. As further discussed below, he has therefore demonstrated good cause for failing to raise this claim earlier. He has also alleged prejudice.[5]
Additionally, the retroactivity of McConnell presents an issue of law that warrants our review; the relevant facts of this case are not in dispute; both parties have had an opportunity before this court to brief this issue and orally argue their positions; and this issue is significant and needs to be decided, as it appears in several cases pending before us. Under these circumstances, we conclude that it is appropriate in this appeal to decide whether McConnell is retroactive. We reach this retroactivity issue in the course of applying the relevant procedural default rules that govern post-conviction habeas corpus proceedings.
I. Procedural bars relevant to Bejarano's claims
Three statutory default provisions are applicable to Bejarano's habeas petition. NRS 34.726(1) provides that a post-conviction habeas petition challenging the validity of a judgment of conviction must be filed within one year after this court issues the remittitur from a timely direct appeal. NRS 34.810(1)(b) provides that a post-conviction habeas petition must be dismissed where the defendant's conviction was the result of a trial and his claims could have been raised either before the trial court, on direct appeal, in a previous petition, or in any other proceeding. And NRS 34.810(2) provides that a second or successive petition must be dismissed if the defendant fails to allege new or different grounds and the prior petition was decided on its merits or if the defendant's failure to assert those grounds in the prior petition constituted an "abuse of the writ."
Bejarano's instant habeas petition was filed over 15 years after this court issued the remittitur from his direct appeal. It was clearly untimely under NRS 34.726(1). Bejarano filed both a direct appeal and two previous post-conviction petitions. Because most of the claims in his instant petition could either have been raised earlier or actually were, they are also subject to default *270 under NRS 34.810(1)(b) or (2). Under one or more of these statutory provisions, Bejarano's instant petition appears procedurally barred.
However, a procedural default is excused if a petitioner establishes both good cause for the default and prejudice.[6] Good cause for failing to file a timely petition or raise a claim in a previous proceeding may be established where the factual or legal basis for the claim was not reasonably available.[7] Prejudice occurs where the errors worked to a defendant's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."[8]
Even absent a showing of good cause, this court will consider a claim if the petitioner can demonstrate that applying the procedural bars would result in a fundamental miscarriage of justice.[9] Such a miscarriage is shown where an invalid death penalty aggravator is stricken and after reweighing "there is a reasonable probability that absent the aggravator the jury would not have imposed death."[10]
We have carefully reviewed the claims Bejarano raises on appeal from the district court's denial of his habeas petition.[11] Except for onehis McConnell challengehe failed to demonstrate good cause for their default. Nor did he demonstrate prejudice, let alone a fundamental miscarriage of justice sufficient to excuse his procedural default. We therefore affirm the district court's denial of those claims.[12]
Bejarano's McConnell challenge, however, warrants further discussion. Because this claim was not reasonably available when Bejarano filed his first, timely post-conviction habeas petition or in subsequent proceedings, there is good cause to excuse its default.[13] The question of prejudice remains. Prejudice will be shown if this court determines two things: McConnell is retroactive and applies here, and there is a reasonable doubt that the jury would have returned a sentence *271 of death absent any stricken aggravating circumstances.[14]
We will address briefly one other possible bar to Bejarano's McConnell claimthe doctrine of the law of the case, which holds that "[t]he law of a first appeal is the law of the case on all subsequent appeals in which the facts are substantially the same."[15] Here, this court has previously affirmed the validity of the robbery felony aggravator and receiving-money aggravator found by the jury. However, the doctrine of the law of the case is not absolute, and we have the discretion to revisit the wisdom of our legal conclusions if we determine that such action is warranted.[16] Such action is of course warranted if we determine that a new rule with retroactive effect contradicts the law of the case.
II. Retroactivity of McConnell
We expounded a three-step analysis in Colwell v. State[17] for determining whether a constitutional rule of criminal procedure applies retroactively in Nevada. The first inquiry is whether the rule under consideration is new.[18] If a rule is not new, retroactivity is not an issue, and the rule applies even on collateral review of a conviction that is final.[19] If the rule is new, the second inquiry is whether the conviction of the person invoking the rule has become final.[20] If the conviction is not finale.g., it is under review on direct appealthen the new rule must be applied.[21] Finally, if the conviction has become final, a new rule does not apply retroactively unless one of two exceptions to nonretroactivity pertains.[22] So the third inquiry is whether the rule falls within either of the exceptions:
Did the rule establish that it is unconstitutional to proscribe certain conduct as criminal or to impose a type of punishment on certain defendants because of their status or offense? Or did it establish a procedure without which the likelihood of an accurate conviction is seriously diminished?[23]
If either question is answered "yes," then the rule applies retroactively.[24]
Here, Bejarano does not dispute that his conviction is final. We must therefore determine whether McConnell announced a new rule, and if so, we must resolve the first and third inquiries under Colwell to determine if the rule set forth in McConnell applies retroactively.
A. Did McConnell set forth a new rule?
Our first inquiry is whether McConnell set forth a new rule. Though no brightline rule exists for determining whether a decision set forth a new rule of law, we have guidelines to follow.[25] For example, a rule is not new when it has merely interpreted and clarified an existing rule or applied an established constitutional principle to govern a case which is closely analogous to those considered in prior case law.[26] On the other hand, a rule is new when it overrules precedent, disapproves a practice sanctioned by prior cases, or overturns a longstanding practice uniformly approved by lower courts.[27]
*272 It is clear that McConnell announced a new rule. We recognize that the overarching legal principle employed by this court in McConnell was certainly not new, i.e., that a State's death penalty scheme must genuinely narrow the class of persons eligible for a death sentence.[28] This principle has been a touchstone of death penalty jurisprudence since 1976.[29] Our decision in McConnell also relied heavily upon the 1988 United States Supreme Court opinion Lowenfield v. Phelps[30] for guidance.
However, our analysis and holding in McConnell were new. We addressed Lowenfield for the first time in light of the death-eligibility narrowing constitutionally required of all state death penalty schemes, and we specifically considered the degree of narrowing produced by a felony-murder conviction, pursuant to NRS 200.030(1)(b), in combination with felony aggravators, pursuant to NRS 200.033(4).[31]
We concluded that the narrowing in such a case was inadequate and, as a result, deemed "it impermissible under the United States and Nevada Constitutions to base an aggravating circumstance in a capital prosecution on the felony upon which a felony murder is predicated."[32] In reaching this conclusion, McConnell acknowledged this court's own contrary precedent, specifically citing two prior decisions that approved the use of the predicate felony as an aggravating circumstance in cases of felony murder.[33]McConnell effectively overruled this precedent.[34] Thus, although predicated upon existing legal principles, McConnell set forth a new rule of death penalty law in Nevada.[35]
B. Does the new rule apply retroactively?
Our remaining inquiry is whether either exception to the usual nonretroactivity of new rules pertains here. We conclude that the McConnell rule is substantive in nature and therefore retroactive.
Substantive rules
As stated above, one instance in which a new rule applies retroactively is when it "establishes that it is unconstitutional to proscribe certain conduct as criminal or to impose a type of punishment on certain defendants because of their status or offense."[36] This instance has been described as an exception to the nonretroactivity of procedural rules.[37] But as we recognized in Colwell, a rule forbidding the criminalization of certain conduct or the imposition of a particular punishment on certain defendants "is actually substantive, not procedural."[38] Because nonretroactivity is the general requirement only for new rules of criminal procedure, a new substantive rule is more properly viewed not as an exception to that requirement, but as a rule that will generally *273 apply retroactively.[39] Regardless of how we characterize this point, we must determine whether McConnell established a procedural or a substantive rule.
The United States Supreme Court has provided guidance for making this determination in Schriro v. Summerlin.[40] Substantive rules include "decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish."[41] In other words, "[a] rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes."[42] Substantive rules warrant retroactive application because they "`carry a significant risk that a defendant stands convicted of an act that the law does not make criminal' or faces a punishment that the law cannot impose."[43]
Rules of procedure, on the other hand, regulate "the manner of determining the defendant's culpability."[44] "They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise."[45]
An example of a new procedural rule is provided by the Supreme Court's 2002 decision in Ring v. Arizona.[46] In Ring, the Supreme Court held that it was unconstitutional for a judge, instead of a jury, to make findings of fact to support a death sentence.[47] We later concluded that Ring set forth a procedural rule, reasoning that it "did not forbid either the criminalization of any conduct or the punishment in any way of any class of defendants."[48] The Supreme Court confirmed this conclusion, holding that Ring propounded a procedural rule that was not retroactive: Ring merely altered the method of determining punishment in accordance with constitutional principles, but not the range of punishment or those persons actually subject to it.[49]
Another example is found in our 2002 decision in Palmer v. State.[50] In Palmer, we held that lifetime supervision is a direct consequence of a guilty plea of which a defendant must be made aware.[51] Although Palmer set forth a new rule, we later concluded that it was procedural and required no retroactive application.[52]
We recently reached a similar conclusion in regard to the Supreme Court's 2004 decision in Crawford v. Washington.[53] In Crawford, the Supreme Court held that to admit testimonial hearsay, the Constitution requires unavailability of the witness and a prior opportunity for cross-examination.[54] Although the Supreme Court has yet to decide the issue, we have concluded that Crawford set forth a new rule of procedure that does not warrant retroactive application.[55]
*274 Our decision in McConnell is not like the procedural rules announced by the Supreme Court in Ring and Crawford or by us in Palmer, concerning the fact-finding process by which a sentence is determined, the admission of hearsay evidence, or the canvassing of defendants who plead guilty. Rather, McConnell concerned the reach of Nevada's death penalty law, determining under what circumstances and to whom it could be constitutionally applied. Applying constitutional strictures, McConnell proscribed the punishment of death based on a felony that is used to establish both first-degree felony murder and aggravated capital murder. Absent retroactive application of this rule, there would be "a significant risk that a defendant . . . faces a punishment that the law cannot impose."[56] Thus, we conclude that McConnell announced a substantive rule of law that must be applied retroactively.
Procedural rules without which the likelihood of an accurate determination is seriously diminished
For the sake of completeness, we will briefly discuss the second exception to nonretroactivity. A new rule of criminal procedure applies retroactively if it "establishes a procedure without which the likelihood of an accurate conviction is seriously diminished."[57] Here, of course, we are concerned with the likelihood of an accurate sentence.
By narrowing the scope of Nevada's death penalty scheme, McConnell arguably increased the likelihood that only those defendants most deserving of a death sentence will receive one. And in this broad sense, it arguably made Nevada's death penalty scheme more accurate. But this effect is a result of the substantive impact of McConnell, not procedural changes. McConnell did discuss one possible new procedure: when the State charges felony murder as an alternative theory of first-degree murder and seeks a death sentence, jurors should be given a verdict form indicating what theory or theories they have relied on in finding first-degree murder.[58] But this procedure is intended simply to satisfy the substantive concerns of McConnell.
Having concluded that McConnell sets forth a new substantive rule that demands retroactive application, we must apply that rule to Bejarano's case.
III. Application of McConnell to Bejarano's case
We held in McConnell that it is unconstitutional to base an aggravating circumstance on the same felony upon which a felony murder is predicated.[59] This holding applies in cases where the defendant was charged with alternative theories of first-degree murder and a special verdict form failed to specify which theory or theories the jury relied upon to convict.[60]
Bejarano was charged with first-degree murder with the use of a deadly weapon. The information alleged in part that he "did willfully, unlawfully, and with malice aforethought, deliberation, and premeditation, and during the course and commission of a robbery, kill." The jurors found Bejarano guilty of first-degree murder with the use of a deadly weapon but returned only a general verdict form that did not indicate which first-degree murder theory or theories they relied upon to find his guilt. The jury later found as one aggravating circumstance that Bejarano committed the murder during "the commission of or attempt to commit or flight after committing robbery" pursuant to NRS 200.033(4).
We conclude that McConnell applies here and invalidates the robbery felony aggravator found by the jury. The State's arguments contending otherwise are unavailing.
The State contends that it charged both deliberate, premeditated murder and felony murder and that it did not charge the two theories in the alternative (apparently because *275 the information used "and" instead of "or" in setting forth the two theories). Because evidence in the record supports the theory of premeditated and deliberate murder, the State suggests that the fact it also charged Bejarano with felony murder can be disregarded, placing this case outside of McConnell's purview.
But McConnell does not permit us to disregard the felony-murder theory simply because there was evidence to support a finding of deliberate and premeditated murder. McConnell applies whenever it is possible that any juror could have relied on a theory of felony murder in finding the defendant guilty of first-degree murder.[61] Here, because the State pursued two distinct theories to convict Bejarano of first-degree murder and jurors could have relied on either or both, we conclude that McConnell squarely applies.[62]
The State also asserts that Bejarano was tried and convicted in 1988 under versions of statutes that differed from the 2003 versions that McConnell addressed (which are the same as the current ones),[63] the earlier versions narrowed death eligibility more than the current statutes, and therefore McConnell does not apply here. The State's assertion remains conclusory and does not even discuss the differences between the versions of the two statutes.
The statutory provisions regarding felony aggravators included one less felony aggravator in 1988 than today: home invasion.[64] Home invasion, however, largely mirrors burglary, which was a felony aggravator in 1988, so the difference between the provisions in 1988 and today is minimal. The same conclusion pertains to the felony-murder provision, NRS 200.030(1)(b). The predicates for felony murder in 1988 included sexual assault, kidnapping, arson, robbery, burglary, and sexual molestation of a child under the age of 14 years.[65] Since then, three predicate felonies have been added: sexual abuse of a child, home invasion, and child abuse.[66] The addition of these three felonies did little to expand the criminal conduct already covered by the statute. In other words, the definition of felony murder in 1988 was only negligibly narrower than it is today.
The State does not identify these differences, let alone attempt to explain how they might be significant under McConnell. Nor does the State address the fact that the statutes required no more criminal intent to establish death eligibility in 1988 than they do today, even though the question of intent was important to this court's decision in McConnell.[67] We conclude that under the constitutional precepts set forth in McConnell, the statutes in 1988 failed to genuinely narrow death eligibility when the same felony served as a basis for both a felony-murder conviction and a felony aggravator.
The robbery felony aggravator must be stricken. Because the receiving-money aggravator pursuant to NRS 200.033(6) was based on the robbery of Wright, we conclude that it is also invalid under McConnell and must be stricken.
IV. Reweighing analysis
Having stricken two aggravators pursuant to McConnell, we must reweigh.[68] *276 Reweighing requires us to answer the following question: Is it clear beyond a reasonable doubt that absent the invalid aggravators the jury still would have imposed a sentence of death?[69] If we answer this question "yes," then the errors were harmless, and Bejarano's McConnell claim is procedurally barred for lack of a showing of prejudice. If we answer this question "no," then prejudice has been shown, and we must remand to the district court for a new penalty hearing. For reasons discussed below, we answer the question "yes."
Removing the robbery and receiving-money aggravators from consideration, four valid aggravators supporting Bejarano's death sentence remain: (1) he was under a sentence of imprisonment, i.e., probation for a 1986 misdemeanor conviction in Idaho for battery on a police officer; (2) he had a previous felony conviction involving the use or threat of violence, i.e., a 1979 conviction in Idaho for aggravated assault; (3) he had a previous felony conviction involving the use or threat of violence, i.e., a 1981 conviction in Idaho for aggravated assault; and (4) the murder was committed to avoid or prevent a lawful arrest.
Bejarano's trial counsel admitted evidence that Bejarano had earned his GED diploma and welfare records, and he argued that Bejarano
was the son of two Mexican immigrants, whose mother died at the age of 3, whose father died at the age of 6, and he bounced around from welfare and foster home to foster home . . . where he eventually ran away and began getting into trouble. . . .
You'll see here that he has been tested, that his intelligent quotient is on the borderline range, that he has limited faculties. Some of you were able to garner that from his testimony, but you only got to listen to him in moments of bravado.
Counsel asked the jury to "please spare his life." We conclude that the case in mitigation was not particularly compelling.
The invalid robbery and receiving-money aggravators were based on the same facts; thus, striking them effectively eliminates the weight of one aggravating circumstance from the case in aggravation. Four valid aggravators remain. Reweighing them against the mitigating evidence, we conclude beyond a reasonable doubt that absent the invalid aggravators the jurors would have still found Bejarano death eligible. We further conclude that they would have returned a sentence of death.
In addition to evidence supporting the aggravators, the State presented numerous witnesses, including other inmates and prison officials, who testified about Bejarano's propensity for violence, which included different threats he made while incarcerated that he would kill again if given the opportunity.
The most damning testimony during the penalty hearing, however, came from Bejarano himself. When asked if he wanted to address the jury about whether they should choose a sentence of life or death, Bejarano replied: "I could really care less, really, to tell you the truth." He later warned the jury: "I know the system. I will be out eventually. You better pray to God I don't get out." When asked how he would react if the jury sentenced him to death, he replied:
I'll probably laugh at all you guys. I'll probably thank you, you know, because you're doing me a favor. You're doing everybody else a favor. But you know, there's nothing else to say, really, except for I'm glad its all over, you know. It's *277 about what had to come to an end sooner or later. There's beaucoupthe other things if you guys ever found out about, I'd be executed five times, you know.
When asked whether he ever offered to kill someone as a favor, he replied: "It's not an offer; it's a freebie." Bejarano was then asked the location of the sawed-off rifle that killed the victim. He replied:
I've never had a sawed-off rifle. I got a pistol, if that's what you want. I've got a .357 magnum, and a two-pistol six shot. Those are the only two at my disposal. They killed Roland, or Mr. Wright, or whoever this guy is you're talking about, you know, but you won't get either one of those, so it doesn't matter.
Bejarano later testified: "I have nothing to clear, no conscience to clear." In a final remark, he scolded the jury: "You're sicker than I am when you sit back and giggle. . . . Believe me, you're sick."
The murder of Roland Wright was senseless, and Bejarano's own testimony during the penalty hearing was defiant and unremorseful. He not only had a significant criminal history, he repeatedly threatened to commit future acts of violence and kill others. It is clear beyond a reasonable doubt that absent the invalid aggravators the jury would have still sentenced Bejarano to death. Bejarano is therefore not entitled to any post-conviction relief.

CONCLUSION
We conclude that this court's decision in McConnell set forth a new rule of substantive law that applies retroactively. Applying McConnell to Bejarano's case, two aggravating circumstances are invalid and must be stricken. After reweighing, Bejarano's death sentence remains intact, and the district court's decision to deny him post-conviction relief is affirmed.
MAUPIN, GIBBONS, HARDESTY and PARRAGUIRRE, JJ., concur.
BECKER, J., with whom DOUGLAS, J., agrees, concurring in part and dissenting in part.
Although I agree with the majority's decision to uphold Bejarano's death sentence, I respectfully disagree with the majority's conclusion that McConnell v. State[1] set forth a new substantive rule that requires complete retroactive application. Rather, I conclude that McConnell set forth a new rule of procedure that, except in one limited instance, warrants no application to death row inmates whose convictions and sentences have become final.[2]
As the majority explains, the United States Supreme Court recognized in Schriro v. Summerlin that substantive rules include "decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish."[3] In my view, McConnell neither narrowed the scope of Nevada's statutes criminalizing first-degree murder nor placed any person or type of conduct previously covered by these statutes beyond the State's power to constitutionally punish. I would hold that with one exception, the State may still pursue a death sentence against a first-degree murderer under McConnell as long as the murder is aggravated by at least one statutory circumstance under NRS 200.033.
More specifically, I conclude that the only circumstance in which the rule in McConnell must be applied retroactively is when the State asserts criminal liability and obtains a conviction solely upon a theory of first-degree felony murder and the only aggravators alleged and found by the jury are based upon one or more of the felonies that support the jury's finding of guilt. Except in this one limited instance, which as I will explain is best viewed as an exception to the nonretroactivity of new procedural rules, McConnell cannot be fairly viewed as having substantively *278 altered Nevada law or impeded the State's ability to pursue a death sentence against those who commit first-degree murder. McConnell merely dictated a new manner by which the State may achieve this end. I therefore disagree with the majority's holding that McConnell set forth a new substantive rule.
Rather, I conclude that McConnell set forth a new rule of procedure. The Supreme Court has stated that a new rule is procedural if it regulates "the manner of determining the defendant's culpability."[4] Here, McConnell did just that by prohibiting the State from pursuing an aggravating circumstance in support of a death sentence when that circumstance arises from the same felony used to convict the defendant of first-degree felony murder.[5] By doing so, McConnell altered the manner, i.e., the procedure, by which the State may pursue a death sentence.
Pertinent language in McConnell supports this conclusion:
We advise the State, therefore, that if it charges alternative theories of first-degree murder intending to seek a death sentence, jurors in the guilt phase should receive a special verdict form that allows them to indicate whether they find first-degree murder based on deliberation and premeditation, felony murder, or both. Without the return of such a form showing that the jury did not rely on felony murder to find first-degree murder, the State cannot use aggravators based on felonies which could support the felony murder.
We further prohibit the State from selecting among multiple felonies that occur during "an indivisible course of conduct having one principal criminal purpose" and using one to establish felony murder and another to support an aggravating circumstance.[6]
Evident from the above directives to the State, McConnell was intended to govern the manner by which the State "charges" a defendant with first-degree capital murder and "select[s]" the aggravators it alleges in pursuit of a death sentence. Such charging decisions must occur at the inception of capital criminal proceedings,[7] well before a trial commences,[8] and are fundamentally procedural in nature. McConnell was also intended to govern the manner by which the jury "indicate[s]" its guilt-phase verdict by requiring it to return "a special verdict form" under certain circumstances. Requiring jurors to use a special form, like regulating the State's charging decisions, concerns a purely procedural aspect of a capital prosecution. For these reasons, I conclude that McConnell squarely displays the characteristics of a new procedural rule and generally warrants no retroactive application.[9]
I will briefly address the two instances under Colwell v. State[10] when new procedural rules do retroactively apply. The first instance is when the new rule is not procedural at allit is substantive.[11] Because, as I explained above, McConnell is procedural, by definition it cannot be substantive.[12] The second instance is when "the likelihood of an accurate conviction is seriously diminished" absent the new procedural rule.[13] As noted, the McConnell rule satisfies this criterion in *279 only one instance: When the only theory supporting the jury's finding of guilt of first-degree murder is a felony-murder theory and the only aggravators found by the penalty jury are based on the same felony or felonies supporting the finding of guilt. In such a case, the likelihood of accuracy would be seriously diminished because under McConnell the defendant is not death eligible. I would apply McConnell retroactively in this one instance, even when the case is final. Otherwise, I conclude that McConnell warrants prospective application only.
For these reasons, I concur in part and dissent in part from the majority opinion.
DOUGLAS, J., concur.
NOTES
[1] 120 Nev. 1043, 102 P.3d 606 (2004), reh'g denied, 121 Nev. 25, 107 P.3d 1287 (2005).
[2] Bejarano v. State, Docket No. 19023 (Order Dismissing Appeal, December 22, 1988).
[3] Bejarano v. State, 106 Nev. 840, 801 P.2d 1388 (1990); Bejarano v. Warden, 112 Nev. 1466, 929 P.2d 922 (1996).
[4] See State v. Powell, 122 Nev. ___, ___, 138 P.3d 453, 456 (2006).
[5] See McNelton v. State, 115 Nev. 396, 415-16, 990 P.2d 1263, 1275-76 (1999) (recognizing that we may consider post-conviction claims raised for the first time on appeal where the appellant alleges good cause for his failure to raise the claims before the district court and prejudice).
[6] See NRS 34.726(1); NRS 34.810(3).
[7] Harris v. Warden, 114 Nev. 956, 959 n. 4, 964 P.2d 785, 787 n. 4 (1998) (citing Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)).
[8] United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original omitted).
[9] State v. Bennett (Bennett III), 119 Nev. 589, 597-98, 81 P.3d 1, 7 (2003); Leslie v. Warden, 118 Nev. 773, 780, 59 P.3d 440, 445 (2002).
[10] Leslie, 118 Nev. at 780, 59 P.3d at 445.
[11] The claims on appeal that were raised in the petition below are as follows: the jury was improperly instructed regarding the premeditation and deliberation necessary to support a first-degree murder conviction; the jury was not instructed that it had to unanimously find aggravating circumstances beyond a reasonable doubt; the prosecutor committed misconduct during the penalty hearing; the under-sentence-of-imprisonment aggravator pursuant to NRS 200.033(1) was invalid because Bejarano was on probation from a misdemeanor (as opposed to a felony) conviction at the time of the murder; the preventing-lawful-arrest aggravator pursuant to NRS 200.033(5) was invalid because it was not narrowed to situations where arrest is imminent; the receiving-money aggravator pursuant to NRS 200.033(6) was invalid because it violated Lane v. State, 114 Nev. 299, 304, 956 P.2d 88, 91 (1998); his trial counsel was ineffective in conducting jury voir dire, encouraging him to testify during the penalty hearing, failing to investigate and present mitigating evidence during his penalty hearing, and failing to object to witness testimony and the prosecutor's cross-examination of him; his first post-conviction counsel was ineffective for failing to have his habeas petition properly authorized by him; and the State failed to disclose recently discovered impeachment evidence against two State witnesses in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[12] In addition, Bejarano contends on appeal that the jury was improperly instructed regarding the limited use of "other matter" character evidence during the penalty hearing; his trial counsel had a conflict of interest in representing him; and the jury was not instructed it had to find the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt in violation of Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Yet these claims were not adequately raised below and are improperly before us for the first time on appeal, as well as procedurally barred because Bejarano has not demonstrated good cause and prejudice excusing his failure to raise them below. See McNelton, 115 Nev. at 415-16, 990 P.2d at 1275-76.
[13] See Clem v. State, 119 Nev. 615, 621, 81 P.3d 521, 525-26 (2003).
[14] See State v. Haberstroh, 119 Nev. 173, 183-84, 69 P.3d 676, 682-84 (2003).
[15] Walker v. State, 85 Nev. 337, 343, 455 P.2d 34, 38 (1969), vacated in part on other grounds, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 750 (1972).
[16] See Pellegrini v. State, 117 Nev. 860, 885, 34 P.3d 519, 535-36 (2001).
[17] 118 Nev. 807, 820-21, 59 P.3d 463, 472 (2002).
[18] Id. at 820, 59 P.3d at 472.
[19] Id.
[20] Id. ("A conviction becomes final when judgment has been entered, the availability of appeal has been exhausted, and a petition for certiorari to the Supreme Court has been denied or the time for such a petition has expired.").
[21] Id.
[22] Id. at 821, 59 P.3d at 472.
[23] Id.
[24] Id.
[25] Id. at 819, 59 P.3d at 472.
[26] Id.
[27] Id. at 819-20, 59 P.3d at 472.
[28] See Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ("[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.").
[29] See, e.g., Gregg v. Georgia, 428 U.S. 153, 196-98, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion); see also Zant, 462 U.S. at 877 & n. 15, 103 S.Ct. 2733.
[30] 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).
[31] See McConnell, 120 Nev. at 1063-70, 102 P.3d at 620-25.
[32] Id. at 1069, 102 P.3d at 624.
[33] Id. at 1062-63, 102 P.3d at 620 (citing Atkins v. State, 112 Nev. 1122, 1134, 923 P.2d 1119, 1127 (1996); Petrocelli v. State, 101 Nev. 46, 52-54, 692 P.2d 503, 508-09 (1985), modified on other grounds by Sonner v. State, 114 Nev. 321, 326-27, 955 P.2d 673, 677 (1998)).
[34] At least two other opinions were also effectively overruled in this regard. See Miranda v. State, 101 Nev. 562, 568-69, 707 P.2d 1121, 1125-26 (1985); Farmer v. State, 101 Nev. 419, 421, 705 P.2d 149, 150 (1985).
[35] Cf. Bennett v. Dist. Ct. (Bennett IV), 121 Nev. 802, 811, 121 P.3d 605, 611 (2005) (stating that McConnell announced "a fundamental departure from death-penalty precedent").
[36] Colwell, 118 Nev. at 820, 59 P.3d at 472.
[37] See, e.g., Horn v. Banks, 536 U.S. 266, 271 n. 5, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002).
[38] Colwell, 118 Nev. at 817, 59 P.3d at 470.
[39] See Schriro v. Summerlin, 542 U.S. 348, 351-52 & 352 n. 4, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).
[40] Id. at 351-52, 124 S.Ct. 2519.
[41] Id. (citations omitted); cf. Colwell, 118 Nev. at 820, 59 P.3d at 472 (paraphrasing the same principle).
[42] Schriro, 542 U.S. at 353, 124 S.Ct. 2519.
[43] Id. at 352, 124 S.Ct. 2519 (quoting Bousley v. United States, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998) (citation and other internal quotation marks omitted)).
[44] Id. at 353, 118 S.Ct. 1604.
[45] Id. at 352, 118 S.Ct. 1604.
[46] 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[47] Id. at 609, 122 S.Ct. 2428.
[48] Colwell, 118 Nev. at 821-22, 59 P.3d at 473.
[49] Schriro, 542 U.S. at 353, 124 S.Ct. 2519.
[50] 118 Nev. 823, 59 P.3d 1192 (2002).
[51] Id. at 825, 59 P.3d at 1193.
[52] Avery v. State, 122 Nev. ___, ___, 129 P.3d 664, 668 (2006).
[53] 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
[54] Id. at 68, 124 S.Ct. 1354.
[55] Ennis v. State, 122 Nev. ___, ___, 137 P.3d 1095, 1101-02 (2006).
[56] Schriro, 542 U.S. at 352, 124 S.Ct. 2519.
[57] Colwell, 118 Nev. at 820, 59 P.3d at 472.
[58] McConnell, 120 Nev. at 1069, 102 P.3d at 624.
[59] Id.
[60] See Bennett IV, 121 Nev. at 808-09, 121 P.3d at 609-10; see also McConnell, 120 Nev. at 1069, 102 P.3d at 624-25.
[61] See Rippo v. State, 122 Nev. ___, ___, 146 P.3d 279, ___ (Adv.Op. No. 93, November 16, 2006) (explaining that McConnell's rationale is concerned not with the adequacy of the evidence of deliberation and premeditation but with whether any juror could have relied on a felony-murder theory to find a defendant guilty of first-degree murder).
[62] See Bennett IV, 121 Nev. at 808-09, 121 P.3d at 609-10.
[63] The only amendment in these two statutes since 2003 is the change of "fireman" to "firefighter" in NRS 200.033(7). See 2005 Nev. Stat., ch. 118, § 6, at 318.
[64] See 1989 Nev. Stat., ch. 631, § 2, at 1451-52 (adding "invasion of the home" to NRS 200.033(4)); 1997 Nev. Stat., ch. 356, § 1, at 1293-94 (removing "sexual assault" from NRS 200.033(4) and placing it in NRS 200.033(13)).
[65] See 1989 Nev. Stat., ch. 408, § 1, at 865.
[66] Id. (adding "sexual abuse of a child" to NRS 200.030(1)(b)); 1989 Nev. Stat., ch. 593, § 1, at 1451 (adding "invasion of the home" to NRS 200.030(1)(b)); 1999 Nev. Stat., ch. 319, § 3, at 1335 (adding "child abuse" to NRS 200.030(1)(b)).
[67] See McConnell, 120 Nev. at 1065-66, 102 P.3d at 622-24.
[68] See, e.g., Bennett III, 119 Nev. at 604, 81 P.3d at 11-12; Leslie, 118 Nev. at 782-83, 59 P.3d at 446-47.

Bejarano and the State filed supplemental briefs discussing the impact of the Supreme Court's recent decision in Brown v. Sanders, 546 U.S. 212, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006), upon our ability to reweigh aggravating and mitigating circumstances after striking one or more aggravating circumstances. We have held that it is proper for this court to engage in reweighing or harmless-error analysis when a jury has erroneously relied upon an invalid aggravating circumstance. See Haberstroh, 119 Nev. at 183, 69 P.3d at 682-84; accord Clemons v. Mississippi, 494 U.S. 738, 741, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). Both parties agree that Brown neither fundamentally alters our prior death penalty jurisprudence in this respect nor impedes our ability to reweigh Bejarano's death sentence.
[69] See Leslie, 118 Nev. at 783, 59 P.3d at 447.
[1] 120 Nev. 1043, 102 P.3d 606 (2004), reh'g denied, 121 Nev. 25, 107 P.3d 1287 (2005).
[2] See Colwell v. State, 118 Nev. 807, 821, 59 P.3d 463, 472 (2002).
[3] 542 U.S. 348, 351-52, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004) (citation omitted).
[4] Id. at 353, 124 S.Ct. 2519.
[5] See McConnell, 120 Nev. at 1069, 102 P.3d at 624.
[6] Id. at 1069-70, 102 P.3d at 624-25 (emphasis added and footnote omitted).
[7] See SCR 250(4)(c) ("No later than 30 days after the filing of an information or indictment, the state must file in the district court a notice of intent to seek the death penalty."); SCR 250(4)(f) ("The state must file with the district court a notice of evidence in aggravation no later than 15 days before trial is to commence.").
[8] See SCR 250(4)(d) ("The court shall not permit the filing of an initial notice of intent to seek the death penalty later than 30 days before trial is set to commence.").
[9] See Colwell, 118 Nev. at 821, 59 P.3d at 472; see also Schriro, 542 U.S. at 352, 124 S.Ct. 2519.
[10] 118 Nev. at 821, 59 P.3d at 472.
[11] See id. at 817, 59 P.3d at 470.
[12] See Schriro, 542 U.S. at 351-52 & 352 n. 4, 124 S.Ct. 2519.
[13] Colwell, 118 Nev. at 821, 59 P.3d at 472.